1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DONALD AMOS,

11          Petitioner,            No. 1:07-cv-00440 ALA (HC)

12     vs.

13   JAMES D. HARTLEY, Warden[1],

14          Respondent.            <u>ORDER</u>

15   _____/

16          Pending before the Court are Donald J. Amos's ("Petitioner's") application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254(a) (doc. 2), Respondent's Answer (doc. 8), and

18   Petitioner's Reply, which he labeled "Petitioner's Traverse" (doc. 9).  Also before the Court are

19   the parties' briefs filed in response to this Court's December 19, 2007 Order requesting

20   additional briefing on the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007) to this

21   matter.  For the reasons set forth below, Petitioner's application is DENIED.

22   /////

23   /////

24

25          [1]James D. Hartley is substituted for his predecessor, Kathy Mendoza-Powers, as the
     warden where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil
26   Procedure.

1

**I**

**A**

On April 22, 1983, a Santa Clara County Superior Court judge found Petitioner guilty of the following four offenses: (1) second degree murder with personal use of a deadly and dangerous weapon in violation of California Penal Code §§ 187 and 12022(b); (2) possession of a concealable firearm by a felon or addict in violation of California Penal Code § 12021(a); (3) receiving stolen property in violation of California Penal Code § 496; and (4) selling or offering to sell LSD in violation of California Penal Code § 11379.  Petitioner was sentenced to a term of fifteen years to life, plus one year for a California Penal Code § 12022(b) enhancement, for his murder conviction.  His convictions on the remaining counts resulted in a sentence of four years, eight months.  The judge ordered that the determinate sentence run consecutively to the indeterminate one.  In this application, Petitioner challenges his sixteen-year sentence for second degree murder.

**B**

The summary of Petitioner's commitment offense was read into the record at Petitioner's parole hearing.  The facts were summarized as follows:

> [O]n October 22nd, 1982, the victim Angela Arbidson . . . age 20 year old [sic] . . . from Portland, Oregon was working on the Stanford University [campus] near the city of South Palo Alto, California.  The address was the home of a Stanford professor.  The victim worked for the professor's wife as a part time housekeeper maid to help defer the cost of her education. [Amos] was employed by a company to deliver trash can liners. . . . The professor's wife had ordered some bags on October [22nd, 1992]. . . . When Amos had arrived at the professor's home, the only other person at the residence was the victim.  Amos, who was known to carry a buck knife, slashed the victim's throat very widely and deeply, severing the trachea to the point that her head was nearly severed from her torso.  He also punctured her heart and liver with the full length of his knife blade.  The professor's 16 year old son returned home from school at approximately 3:15 P.M.  The son found an invoice in the driveway containing the name of [the company that sold the trash can liners].  He put the invoice in a vehicle prior to entering the house.  The entryway and the hallway were splattered with blood and there was . . . a large pool of blood

2

on the floor.  The victim was found in the living room approximately 15 feet away lying on the side of the couch. . . . She was gasping for life, but died within minutes while the young man called for help.  After the murder, Amos had drove [sic] approximately 25 miles to his apartment in San Jose.  He told his wife that he had been attacked by a dog, changed his clothes, throwing the trousers into the corner of the room and his torn shirt into the hallway.  He told his wife not to mention the attack to anyone because he was embarrassed.  Amos turned in his invoices around five P.M. on the day of the murder.  Although he was scheduled to work on the weekend, advised an employee that he was leaving town to visit relatives over the weekend.  Amos drove his wife and childrens [sic] about 65 miles away to visit their friends.  When he returned to the apartment, he found police had already searched it.  He fled to his mother's house and parked his car in the garage so it would not be seen.  Amos' wife returned to the apartment the next day for clothing and other items.  Amos stayed at the friends' house [about] a block away[. H]e obtained another license plate for the car from the friend, drove his brother's car home, and changed the license plate and serviced his car.  He drove his family to a motel in Salt Lake City, Utah, where his wife registered under a false address and false car license plate number.  Amos contacted a former Army buddy and stayed with him for approximately three weeks upon his return to San Jose.  At the urging of his mother, he turned himself in to authorities on November 14th, 1992.  Amos claimed that he had blacked out after drinking some beer.  He said the next thing he remembered was driving in his automobile on the freeway.  He doesn't know what happened to his shirt, so he made up the story about the dog attacking him.  He said that he did not know what happened to his buck knife and later testified that he forced himself to try to remember what happened on the day of the murder because his wife told him she was going to divorce him.  He recalled that he had purchased the beer and had driven to [the] Stanford campus.  He found the front door ajar and the victim lying on the floor in a pool of blood. . . . He picked her up and carried her to the couch to comfort her.  He panicked and ran from the house because [he] was on probation.  His shirt got caught in the door and ripped when he pulled it free.  He lost his knife because . . .  a loose seam ripped it on a belt loop.  Amos' apartment was searched.  Police recovered a shirt that was torn, heavily damaged, and trousers that had blood stains on the font thigh area and match the blood of the victim. . . .

He said that he was remorseful.  He has indicated that he did not kill this woman.  He is remorseful for not doing the right thing and calling the police.  He had indicated he'd gotten out of jail in January and the following October was when the murder occurred.  He was on probation.  He was a little tipsy from beer and he believes he'd smoked a little pot that day.  He said he didn't want to talk to the police at the crime scene.  Regarding the victim, he

1
2
3
4

    said he did put her on the couch.  He said, [he didn't] know why.
He didn't see the throat until he put her on the couch and then he'd
freaked and totally got upset and left.  On the way out, the door
shut and the shirttail got caught in the door.  He indicated that he
had on a Pendleton that had pearl snaps, not buttons, and there was
a button that was found under the body.  It was never, evidently,
put into evidence.

5   (Resp't's Ex. 2 13-19.)

6   **C**

7       On March 14, 2005, the California Board of Prison Terms ("BPT") found that Petitioner

8   was "not suitable for parole and would pose an unreasonable risk of danger to society or threat to

9   public safety if released from prison." (Resp't's Ex. 2 78.)  It denied further parole review for

10   three years.  Its decision reads as follows:

11
12
13

    The panel reviewed all information received from the Public and
relied on the following circumstances in concluding that the
prisoner is not suitable for parole and would pose an unreasonable
risk of danger to society or threat to public safety if released from
prison. . . .

14
15
16
17
18
19
20
21
22
23
24
25
26

    One of the reasons was, one, the offense.  The offense was carried
out in an especially cruel and callous manner.  The Panel is unable
to find a motive for this.  The offense was carried out in a
dispassionate manner.  It was like an execution style murder.  The
victim was abused.  The offense was carried out in a manner that
showed a total callous disregard for another human being or the
suffering of another human being.  The motive for the crime, as I
previously stated, not only was inexplicable, but we really couldn't
find a motive for this crime, other than that it was senseless.  The
conclusions were drawn from the Statement of Facts wherein on
October 22nd, 1982, the victim, a 20 year old [sic] college student
from the state of Oregon, was working at her professor's home to
earn extra money.  And it appears that the prisoner, armed with a
buck knife, slit the victim's throat widely and completely enough
to sever her trachea to the point that her head was nearly severed
from her torso.  The prisoner did have an escalating pattern of
criminal conduct, contact with law enforcement.  Has a history of
unstable, in some cases, tumultuous relationships.  He failed
previous grants of probation.  He failed to profit from society's
previous attempts to correct his criminality, which included
probation and county jail.  Under unstable social history, certainly
there are some dynamics that appeared to be unstable, some of
them dealing with the dynamics of his family situation.  The
prisoner has not fully profited, I should say, from his participation
in some of the self-help programs, especially substance abuse

4

1   programs.  Prisoner did receive one 128 since his last hearing for
    contraband.  But the most compelling reason, Mr. Amos, for this
2   denial was the psychological evaluation, for a three year denial.
    And the Panel felt that it's going to take at least three years to
3   make some progress in terms of – from a psychological standpoint.
    It's not a very positive report.  Report under Assessment of
4   Dangerness [sic], assessed you at a level higher than the Panel –
    the risk of dangerness [sic] higher than the panel can take.  A risk
5   of putting you back out into the public and it's going to take you at
    least three years to make the kind of progress that you need to
6   make.  The doctor writes in one paragraph, I would still have
    concerns that he may pose a greater than average risk at this point
7   given the (inaudible).  That was noted above.  Parole plans, did not
    have a problem with your parole plans.  It appears that you have
8   family that cares about you.  Father is offering you a place to
    reside and offering you the job as a caregiver.  Certainly if
9   available, if at all possible, you should tighten up your parole plans
    in terms of employment plans.  Certainly from the residential
10  plans, they would not seem to be a problem.  The hearing Panel
    notes that response to Penal Code 3042 notices indicating
11  opposition to a finding of suitability, that there was a letter in the
    file from [the] District Attorney.  We had the Deputy District
12  Attorney here from Santa Clara today, [he] also spoke in
    opposition to a finding of suitability.  And there was a letter also in
13  the file from the Department of Public Safety from Stanford
    University, and it spoke very strongly in opposition to a finding of
14  suitability.  We have victims here today and the victim's father
    spoke in opposition on behalf of the family to a finding of
15  suitability.  Panel makes the following findings: The Panel finds
    that you need to continue to participate in self-help programs, the
16  kind that would enable you to face, discuss, understand, and cope
    with stressful situations in a non-destructive manner.  Certainly at
17  the top of the list would be things like anger management,
    substance abuse programs.  Also, there are some things that . . . we
18  want to commend you for.  Certainly we want to commend you for
    the array of vocational programs that you've participated in, the
19  welding, as your counselor pointed out, the automotive machine
    shop.  You have at least four vocational programs that you
20  participated in.  From that perspective, you're well ahead of a lot
    of other inmates that appear before us.  You've developed some
21  vocations, some very good vocations, that you could use on the
    outside.  The other area.  As a worker, as a porter, you get good to
22  above work reports and certainly we want to give you some kudos
    for that.  Appears [sic] that you're active in the chapel service.
23  Certainly that's in your favor.  And you're still taking NA and AA.
    However, you don't know the steps, so that is a concern.  If you're
24  going to participate in a program, we would expect that you know
    the foundation of the program.  And in AA and NA, the steps are
25  the foundation of those two programs, so certainly we would
    expect that you would know those – that you would participate in
26  those kinds of programs with a mission.  However, those positive

5

aspects of your behavior at this time does not outweigh the fact of
unsuitability, so your parole is going to be denied for three years.

(*Id.* at 78-82.)

**D**

Petitioner challenged the BPT's March 14, 2005 decision in a state petition for a writ of
habeas corpus before the Santa Clara County Superior Court. The Santa Clara County Superior
Court denied his petition on August 29, 2005.

The court stated:

> The petition for a writ of habeas corpus, presented by
> DONALD J. AMOS is denied. This Court has examined the
> Parole Board proceedings in light of the recent Appellate Court
> cases of *In re Dannenberg* (2005) 34 Cal. 4th 1061 and *In re
> DeLuna* (2005) 126 Cal. App. 4th 585. The Board's decision is
> supported by its reliance on the factual information presented.
> Any errors regarding the Board's consideration of unproven prior
> bad acts, or Petitioner's right not to admit his guilt, are harmless
> because "the Board would have denied parole based upon the
> supported factors." (*DeLuna, supra*, 126 Cal. App. 4th at p. 598.)

(Resp't's Ex. 2 1). Petitioner filed a habeas petition with the California Supreme Court. That
court summarily denied the claim, and provided nothing more than the following: "(*See In re
Rosenkrantz* (2002) 29 Cal. 4th 616; *In re Dannenberg* (2005) 34 Cal. 4th 1061.)" The citations
were not accompanied by explanatory parentheticals.

**II**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an
application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court
judgment "shall not be granted with respect to any claim that was adjudicated on the merits" in
state court unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an
>        unreasonable application of, clearly established Federal
>        law, as determined by the Supreme Court of the United
>        States; or

1     (2)     resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence
2               presented in the State court proceeding.

3   28 U.S.C. § 2254(d).

4      Challenges to parole denials are construed as procedural due process claims. "'A

5   procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally

6   protected liberty or property interest, and (2) a denial of adequate procedural protections.'"

7   *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (quoting *Brewster v. Bd. of Educ. of*

8   *Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998)).  The Ninth Circuit has held that

9   "California Penal code section 3401 vests . . . California prisoners whose sentences provide for

10  the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

11  release date,".  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (citing *Sass v. Cal. Bd. of*

12  *Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)).  This Court is bound by that conclusion.

13  *See Zuniga v. United Can Co.,* 812 F.2d 443, 450 (9th Cir. 1987) (citation omitted) ("District

14  courts are, of course, bound by the law of their own circuit, and 'are not to resolve splits between

15  circuits no matter how egregiously in error they may feel their own circuit to be.'")

### III

      Petitioner argues that he is entitled to habeas relief under 28 U.S.C. § 2254 on several

grounds.  He first alleges, citing *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S.

1 (1979), that the BPT violated his due process rights by relying on his commitment offense and

other unchanging factors to deny parole.  He asserts that because the board relied on static

factors,

     under the clearly established Supreme Court precedent of
<u>Greenholtz,</u> the board's decision unreasonably violated petitioner's
federal due process rights in at least five (5) important ways:

     (1)     by failing to minimize the risk of an erroneous
decision,

(2)    by failing to respect the goal of rehabilitation

(3)    by failing "as a guide to the inmate for his future behavior,"

(4)    by serving as a "guilt determination" as part of a discouraged "adversary process"

(5)    by "encourage[ing] a continuing state of adversary relations between society and the inmate."

(Pet. Writ of Habeas Corpus Attach. 15-16.)

Petitioner's assertion that the BPT's reliance on unchanging factors violates due process under *Greenholtz* is without merit. Petitioner supports his claim by citing to dicta. *Greenholtz*, 442 U.S. at 12-15. For example, a portion of the opinion Petitioner cites in his petition reads as follows:

It is important that we not overlook the ultimate purpose of parole which is a component of the long-range objective of rehabilitation. The fact that anticipations and hopes for rehabilitation programs have fallen far short of expectations of a generation ago need not lead states to abandon hopes for those objectives; states may adopt a balanced approach in making parole determinations, as in all problems of administering the correctional systems. The objective of rehabilitating convicted persons to be useful, law-abiding members of society can remain a goal no matter how disappointing the progress. But it will not contribute to these desirable objectives to invite or encourage a continuing state of adversary relations between society and the inmate.

*Id.* at 13-14. These statements are not the holding of the case, and, thus, do not bind any court.

In *Greenholtz*, the United States Supreme Court held that the Nebraska statute in question "affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more." *Id.* at 16. The Supreme Court also found that "nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular 'evidence' in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release." *Id.* at

8

15.  Contrary to Petitioner's assertions, *Greenholtz* does not establish what kind of evidence a parole board must rely on.  Petitioner was afforded an opportunity to be heard and was given the reasons why parole was denied.  His parole denial conforms with the process described in *Greenholtz*.  The state court did not, therefore, reach a decision that "decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" when it rejected this claim.  28 U.S.C. § 2254(d)(1).

**IV**

**A**

In his brief filed in response to the Court's request for further briefing regarding the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007), Petitioner claims that the BPT's decision was not supported by some evidence.  Petitioner contends that *Irons*'s "some evidence" standard applies to his claims.  Petitioner cites *Hayward v. Marshall*, 512 F.3d 536 (9th Cir. 2008) *vacated by*, *reh'g en banc*, *granted by*, 512 F.3d 536 (9th Cir. 2008) for a related proposition:  that the "some evidence" used to deny parole must consist of evidence that the prisoner poses an unreasonable risk to society if released.  He claims that the BPT's March 14, 2005 decision was not supported by the kind of evidence that *Irons* and *Hayward* require.

In *Superintendent v. Hill*, 472 U.S. 445, 454 (1985), the Supreme Court held that "revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record."  (Citation omitted).  The Ninth Circuit has held that the "some evidence" standard announced in *Hill* applies to parole release proceedings.  *Sass*, 461 F.3d at 1128-29.  This Court is bound by that holding.  *See Zuniga*, 812 F.2d at 450 (citation omitted) ("District courts are, of course, bound by the law of their own circuit and 'are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be.").  Therefore, the court rejects Respondent's argument that some evidence is not the standard because it is not "clearly

9

established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S. at 455-56).  "*Hill's* some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'"  *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

In *Hayward* the Ninth Circuit stated that "[f]or our purposes, then, '[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety.  Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.'"  *Hayward*, 512 F.3d at 543 (quoting *In re Lee*, 143 Cal. App. 4th 1400, 1408 (Cal. Ct. App. 2006)).  However, the decision in *Hayward* has been vacated pending rehearing en banc.  527 F.3d 797 (9th Cir. 2008).  *Irons* controls.

In *Irons*, 505 F.3d at 853, the Court held that

> where, as here, there is some evidence to support a finding that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation to the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we cannot say that the state court unreasonably applied *Hill*'s "some evidence" principle.

In *Irons*, the record showed that the BPT relied on the commitment offense in determining that the prisoner was not suitable for release on parole.  *Id.* at 852.  The *Irons* court held that prisoner's commitment offense, on its own, may justify parole denial if "the Board can 'point to

factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released." *Irons*, 505 F.3d at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061, 1071 (2005)).  Thus, pursuant to *Irons,* the BPT may rely on unchanging factors to find that an inmate is unsuitable for parole.

The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [*Sass*, 461 F.3d at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir. 2002)] and all we hold today, therefore, is that, given the particular circumstances of the offenses of these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."  *Irons*, 505 F.3d at 853-54.  In an unusual comment in *Irons*, the panel expressed its aspiration that some future court decision will conclude that the BPT had the duty to grant parole where "there was substantial evidence in the record demonstrating rehabilitation." *Id.* at 854.  The Court stated:

> We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Id.*

The *Irons* panel did not cite any authority to support its prognostication that the denial by the state court of habeas corpus relief, under such circumstances, would be "contrary to, or [involve] an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in violation of 28 U.S.C. § 2254(d)(1).  No presently binding Ninth Circuit decision has fulfilled the prediction of the *Irons*'s panel.

In the precedential portion of the *Irons* decision, the Court held that "we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for

parole, and then must review the record in order to determine whether the state court decision

holding that these findings were supported by 'some evidence' constituted an unreasonable

application of the 'some evidence' principle articulated in *Hill*."  *Irons*, 505 F.3d at 851.

Accordingly, this Court must determine whether applicable California law was followed in

denying Petitioner parole.

**B**

Section 3041(b) of the California Penal Code provides that the BPT:

> shall set a release date unless it determines the gravity of the
> offense or offenses, or the timing and gravity of current or past
> convicted offense or offenses, is such that consideration of the
> public safety requires a more lengthy period of incarceration for
> this individual, and that a parole date, therefore, cannot be fixed at
> this meeting.

Section 2402 of the California Code of Regulations sets forth the circumstances that tend to

show unsuitability for parole release:

> § 2402. Determination of Suitability.

> (a) General. The panel shall first determine whether the life
> prisoner is suitable for release on parole. Regardless of the length
> of time served, a life prisoner shall be found unsuitable for and
> denied parole if in the judgment of the panel the prisoner will pose
> an unreasonable risk of danger to society if released from prison.

> (b) Information Considered. All relevant, reliable information
> available to the panel shall be considered in determining suitability
> for parole. Such information shall include the circumstances of the
> prisoner's social history; past and present mental state; past
> criminal history, including involvement in other criminal
> misconduct which is reliably documented; the base and other
> commitment offenses, including behavior before, during and after
> the crime; past and present attitude toward the crime; any
> conditions of treatment or control, including the use of special
> conditions under which the prisoner may safely be released to the
> community; and any other information which bears on the
> prisoner's suitability for release. Circumstances which taken alone
> may not firmly establish unsuitability for parole may contribute to

a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

1   (6) Institutional Behavior. The prisoner has engaged in serious
2   misconduct in prison or jail.

3   (d) Circumstances Tending to Show Suitability. The following
    circumstances each tend to show that the prisoner is suitable for
4   release. The circumstances are set forth as general guidelines; the
    importance attached to any circumstance or combination of
5   circumstances in a particular case is left to the judgment of the
    panel. Circumstances tending to indicate suitability include:
6

7   (1) No Juvenile Record. The prisoner does not have a record of
    assaulting others as a juvenile or committing crimes with a
8   potential of personal harm to victims.

9   (2) Stable Social History. The prisoner has experienced reasonably
10  stable relationships with others.

11  (3) Signs of Remorse. The prisoner performed acts which tend to
    indicate the presence of remorse, such as attempting to repair the
12  damage, seeking help for or relieving suffering of the victim, or
    indicating that he understands the nature and magnitude of the
13  offense.

14
15  (4) Motivation for Crime. The prisoner committed his crime as the
    result of significant stress in his life, especially if the stress has
16  built over a long period of time.

17  (5) Battered Woman Syndrome. At the time of the commission of
    the crime, the prisoner suffered from Battered Woman Syndrome,
18  as defined in section 2000(b), and it appears the criminal behavior
    was the result of that victimization.
19

20  (6) Lack of Criminal History. The prisoner lacks any significant
    history of violent crime.
21

22  (7) Age. The prisoner's present age reduces the probability of
    recidivism.
23

24  (8) Understanding and Plans for Future. The prisoner has made
    realistic plans for release or has developed marketable skills that
25  can be put to use upon release.

26

14

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

The BPT found Petitioner unsuitable based on several factors, including his commitment offense. (Resp't's Ex. 2.)  First, the BPT found Petitioner unsuitable because of the severity of the commitment offense.  The summary of the crime from the probationer's report read into the record supports this finding.  The victim was murdered execution-style and the crime was carried out in a manner that indicated callous disregard for human life.  The victim's head was nearly severed from her torso, and she was stabbed in the heart and liver.  When found, she was still gasping for breath, but soon succumbed to her injuries.

The probation report also supports the BPT's finding that the motive for the crime was inexplicable.  The victim and Petitioner were complete strangers.  They appear to have had no interactions prior to the murder.  The only possible motive is that Petitioner's wife had informed him that she wanted a divorce on the day of the crime.  When Petitioner's wife saw a photo of the victim, she thought it was a photograph of herself, taken while she was in high school.  The probation report implies that the physical similarity of the victim and Petitioner's ex-wife set him off.  Also, the BPT based their evaluation of the crime on facts that went beyond the minimum elements of the California second degree murder statute.  *See Irons*, 505 F.3d at 852 ("the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released.") (quoting *Dannenberg*, 34 Cal. 4th 1061, 1071 (2005)).  The record supports the BPT's finding of unsuitability based on the commitment offense factor described in section 2402(c)(1).

The BPT also found that Petitioner had a history of escalating criminal conduct.  The Petitioner's criminal record listed in the probation report, to which he admitted at his criminal trial, supports the BPT's finding.  Before he was convicted of the underlying crime in this case,

15

1 Petitioner was convicted of two additional felonies.  On the date of his conviction for second

2 degree murder, Petitioner was also convicted of possession of a concealable firearm by a felon or

3 addict and receiving stolen property.  While in prison, Petitioner received four serious prison

4 rule violations and five minor rule violations, although he had no serious violations between the

5 parole hearing at issue here and his prior hearing.  He did have one more minor violation

6 between the two hearings, for possession of contraband.  Both Petitioner's prior criminal history,

7 and prison disciplinary record sufficiently support the BPT's finding of unsuitability._____

8 _____The BPT further found that Petitioner had a history of unstable social relationships, a

9 finding supported by Petitioner's psychological evaluation.  The evaluation stated that petitioner

10 had been divorced twice.  It also recounted an incident that occurred when Petitioner was seven.

11 Petitioner stepped on his five year-old brother's head, and his parents institutionalized him as a

12 result.  Petitioner also informed the evaluator that when he was a teenager, his parents called law

13 enforcement on a few occasions because Petitioner was incorrigible.  This evidence supports the

14 BPT's finding of a history of unstable relationships.

15 Last, the BPT cited Petitioner's February 24, 2005 psychological evaluation as the most

16 compelling reason for its parole denial.  The portion of the report directly referenced by the

17 BPT's decision reads as follows:

18 Based on the history and research data, there exists a
moderate probability that [Petitioner] will engage in criminal
19 activities to sustain himself in the future which is in part based on
current risk assessment tools.  The risk for future violence in the
20 case of Inmate Amos is moderately high to high when compared to
other inmates based on his score on the Hare [Psychopathy
21 Checklist Revised].  There does appear to be a substantial risk for
society at this time. . . . There is evidence to support that in a less
22 controlled setting, such as a return to the community, he would not
be able to hold his current gains.

23
(Resp't's Ex. 5 13.)  The report also notes that Petitioner has had a twenty year diagnosis of
24
psychomotor epilepsy, and that his Psychopathy Checklist Revised report indicated an
25
"increased degree of psychopathy."  (*Id.* at 8.)  The evaluator writes that " [i]nmate Amos is in
26

1    the moderately high end of significance on the [Hare Psychopathy Checklist Revised] still

2    suggesting a statistically higher propensity for criminal reoffending." (*Id*.)  This report also

3    supports the BPT's determination that Petitioner was unsuitable for parole.

4         There is some evidence to support each factor cited by the BPT in its decision.

5    Accordingly, its findings are sufficient to demonstrate that  Petitioner is unsuitable for parole

6    pursuant to Cal. Pen. Code § 3041(b) and Cal. Code Regs. tit. 15, § 2402.  Therefore, the state

7    court's denial of the petition for habeas corpus on this ground was not "contrary to, or

8    involv[ing] an unreasonable application of, clearly established federal law, as determined by the

9    Supreme Court of the United States."  28 U.S.C. § 2254(d).

10                                         **IV**

11        Petitioner raises four additional claims in his petition.  He asserts the following: (1) that

12   the BPT misapplied the appropriate factors in denying petitioner parole; (2) that "the panel

13   permitted introduction of improper, unproven and unrelated  offenses;" (3) that his "right not to

14   admit guilt nor discuss the crime under Penal Code 5011 (b) [sic] was abrogated by repeated

15   references to his denial of guilt;" that "under the 'particular circumstances of the crime, [his] tern

16   has exceeded the constitutional maximum;"  and (4) that "the superior court's order was contrary

17   to or an unreasonable application of clearly established Federal law."  (Pet. Writ of Habeas

18   Corpus Attach. 18, 25, 31, & 37.)  Each claim will be addressed in turn.

19                                         **A**

20        Petitioner alleges that the BPT misapplied the factors enumerated in section 2402 of Title

21   15 of the California Code of Regulations.  He argues that this misapplication violated his due

22   process rights, regardless of whether the "some evidence" standard was met.  Petitioner asserts

23   that the board misapplied the "Previous Record of Violence" and "Signs of Remorse" factors.

24   He contends that the BPT's use of Petitioner's criminal history violated due process.

25                                         **1**

26        Petitioner's "misapplication" arguments suggest that the BPT must give certain factors

1 more weight than others. However, section 2402 leaves the precise weighing of factors to the

2 BPT. Cal. Code Regs. tit. 15 §2402(c), (d). It does not require that the board find any particular

3 number of factors indicating unsuitability to deny parole, nor does it mandate what weight the

4 board give those factors. *Id.* Section 2402(b) permits the BPT to look at all relevant

5 information, and permits their decision to be based on more than the enumerated factors in the

6 sections that follow. Neither the list of factors in section 2402(c) nor the list in 2402(d) is

7 exhaustive. As California law does not prescribe any specific procedure for the BPT to follow,

8 this Court may not review how the BPT weighed the factors it cited, nor whether it used certain

9 factors to make its decision. *See Irons,* 505 F.3d at 851 (holding that a federal court "must look

10 to California law to determine the findings that are necessary to deem a prisoner unsuitable for

11 parole, and then must review the record in order to determine whether the state court decision

12 holding that these findings were supported by 'some evidence' constituted an unreasonable

13 application of the 'some evidence' principle articulated in *Hill*.").

14     Petitioner argues in a related "misapplication of factors" claim that the psychological

15 report on which the BPT relied repeatedly referenced Petitioner's refusal to admit guilt.

16 However, Petitioner does not cite to any portion of the report that demonstrates the BPT relied

17 on his alleged refusal to admit guilt. As discussed above, the BPT relied on the fact that the

18 psychological evaluation stated that petitioner had a significant level of psychopathy, and that

19 there was a moderate to high risk that he would engage in violent behavior if released.

20 **2**

21     Petitioner cites *Biggs v. Terhune* to support his argument that the BPT's use of

22 Petitioner's criminal history violated his due process rights. The relevant portion of that decision

23 reads as follows:

24         Over time, however, should Biggs continue to demonstrate
        exemplary behavior and evidence of rehabilitation, denying him a

25         parole date simply because of the nature of Biggs' offense and
        prior conduct would raise serious questions involving his liberty

26         interest in parole.

1   *Biggs*, 334 F.3d at 917.  Like the *Irons* prognostication, this statement is not binding.  Both Ninth

2   Circuit precedent and California law permit the BPT to rely on unchanging factors alone to reach

3   its decision.  *See, e.g.*, *Irons*, 505 F.3d at 852 (holding that the BPT's reliance on the petitioner's

4   commitment offense alone satisfied the "some evidence" standard); *Dannenberg*, 34 Cal. 4th at

5   1071 (holding that so long as the BPT can point to factors beyond the minimum elements of the

6   crime it may rely solely on a prisoner's commitment offense to deny parole).

7        Petitioner also argues that his due process rights were violated because  "the panel

8   permitted introduction of improper, unproven and unrelated offenses" in evaluating Petitioner's

9   previous record of violence.  (Pet. Writ of Habeas Corpus Attach. 23, 25.)  Petitioner does not

10  demonstrate how the introduction of the information in question affected the BPT's decision to

11  deny him parole.  Petitioner had several prior felony convictions.  The BPT listed in detail the

12  crimes of which Petitioner was previously convicted.  (BPT Decision at 20-22.)  It was careful to

13  note the crimes for which Petitioner was arrested but not convicted.  The convictions alone

14  constitute some evidence that Petitioner had an escalating criminal history.  There is no evidence

15  that the BPT relied on unproven offenses in reaching that conclusion.

16        Indeed, Petitioner cites no clearly established federal law that permits this Court to

17  engage in any further review of the BPT's decision beyond the "some evidence" inquiry.  As

18  previously stated, this Court finds that the BPT's decision meets the some evidence standard.

19  Accordingly, the BPT did not misapply the relevant California law in denying Petitioner parole.

20  The decision of the state court as to this claim satisfies due process.

21                                          **B**

22        Petitioner also alleges that his "right not to admit guilt nor discuss the crime under

23  [California] Penal Code 5011 (b) [sic] was abrogated by repeated references to his denial of

24  guilt."  (Pet. Writ of Habeas Corpus Attach. 31.)  This is an issue of state law.  A federal writ of

25  habeas corpus is not available to a state prisoner for an alleged error in the interpretation or

26  application of state law.  *Estelle v. Mcguire*, 502 U.S. 62, 67 (1991) ("We have stated many

1    times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v.*

2    *Jeffers*, 497 U.S. 764, 780 (1990)**).**  Therefore, this Court may not review this claim.

### D

4          Petitioner claims that "under the 'particular circumstances' of the crime, [his] term has

5    exceeded the constitutional maximum." (Pet. Writ Habeas Corpus 48.)  Petitioner uses *In re*

6    *Dannenberg*, 34 Cal. 4th 1061 to support his claim.  Petitioner cites the following portion of that

7    decision:

> Of course, even if sentenced to a life-maximum term, no prisoner
> can be held for a period grossly disproportionate to his or her
> individual culpability for the commitment offense. Such excessive
> confinement, we have held, violates the cruel or unusual
> punishment clause (art. I, § 17) of the California Constitution.
> Thus, we acknowledge, section 3041, subdivision (b) cannot
> authorize such an inmate's retention, even for reasons of public
> safety, beyond this constitutional maximum period of confinement.

*Id.* at 1096 (citation omitted).  Petitioner alleges a violation of the California Constitution.

Petitioner does not cite Federal law, let alone "clearly established Federal law, as determined by

the Supreme Court" to support this claim. 28 U.S.C. § 2254(d)(1).  This claim is an issue of state

law and may not be addressed by this Court in a post-AEDPA habeas corpus petition. *See* 28

U.S.C. § 2254(d)(1).

### E

          Finally, Petitioner argues that "the Superior Court's order was contrary to or an

unreasonable application of clearly established federal law."  (Pet. Writ of Habeas Corpus

Attach. 37.)  As stated above, this Court finds that there was "some evidence" to support the

BPT's decision that Petitioner was unsuitable for parole, as well as each of their specific

findings, under the standard set forth in *Irons*.  Therefore, the Santa Clara Superior Court did not

reach a decision "that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §

2254(d)(1).

1    Accordingly, Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. §

2    2254(a) (doc. 2) is DENIED.

3    The clerk is directed to enter judgment and close the case.

4    /////

5    DATED: July 18, 2008

6    /s/ Arthur L. Alarcón
     UNITED STATES CIRCUIT JUDGE
7    Sitting by Designation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

21